## THE CARDIGANSHIRE.

(District Court, S. D. California. S. D. December 16, 1925.)

### No. 1451.

**1. Shipping ⟊117—Vessel receiving specific lot of merchandise, regardless of marks, has duty to segregate it from other like merchandise, and discharge it without confusion.**

Vessel receiving specific lot of cement from particular consignor, regardless of marks and brands, has duty to segregate it from other like merchandise, so that it may be discharged without confusion.

**2. Shipping ⟊117—Consignee of cement of particular brand has right to assume that it, and no other, will be delivered to its agent.**

Consignee of cement of particular brand has right to assume that it, and no other, will be delivered to its agent.

**3. Shipping ⟊132(5)—Evidence held to show that cement was not mixed with different brand when delivered to vessel.**

Evidence *held* to warrant finding that cement consigned to libelant was not mixed with inferior brand when delivered to vessel, but that intermingling of brands was through vessel's negligence.

**4. Shipping ⟊129—Consignee held not to have had notice through its agent that cement, as unloaded from vessel, was of mixed brands.**

That agent firm, in charge of unloading of cement from vessel into cars, made charge against consignee for work of loading cars, and corresponding deduction from stevedore's charge against ship, *held* not to show that consignee's agent had notice that brands of cement were improperly mixed, with resultant duty to correct mistake, as affecting right to recover damages of ship for such confusion of goods in delivery.

**5. Shipping ⟊131—Recovery for delivery of particular quantity of cement of inferior brand to consignee held unwarranted.**

In libel against vessel for confusion of brands of cement and wrongful delivery of cement of inferior brand, recovery as to certain quantity of inferior brand, which purchaser from libelant had refused to return to ship's agent, who was endeavoring to correct mistake, *held* unwarranted.

**6. Shipping ⟊142—Respondent, in libel for damages for confusion of separate consignments of cement, held estopped to assert particular defense.**

Where consignee, within one month after vessel's wrongful delivery of cement of mixed brands to purchaser from consignee, discussed matter with ship's agent, and was told that best efforts to correct mistake were being made, *held*, vessel was estopped to defend libel for damages on ground that claims had not been filed within time limited by bills of lading.

**7. Shipping ⟊140—Conditions of limitation in bills of lading must be given reasonable and not unvarying effect, dependent on facts of particular case.**

Conditions of limitation in bills of lading must be given reasonable and not unvarying effect, dependent on facts of particular case.

**8. Shipping ⟊142—Bills of lading, requiring filing of claims within particular time after "arrival of ship," construed.**

"Arrival of ship," within meaning of bills of lading requiring claims to be filed within specific time after "date of the arrival of the ship at destination," must be construed, where misdelivery is charged, as meaning date when cargo is discharged or offered for delivery.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Arrive—Arrival (of Vessel).]

**9. Shipping ⟊131—Market value at place of destination held measure of damages for misdelivery of cement, in view of stipulation of counsel.**

In libel for misdelivery of inferior brand of cement to consignee libelant, measure of libelant's recovery *held* market value at place of destination, rather than invoice value, in view of counsel's stipulation to that effect.

In Admiralty. Libel by the Beaver Portland Cement Company against the steamship Cardiganshire, her engines, boilers, tackle, apparel, and furniture, with the Royal Mail Steam Packet Company as claimant. Decree for libelant.

Lawler & Degnan, of Los Angeles, Cal., for libelant.

McCutchen, Olney, Mannon & Greene and Farnham P. Griffiths, all of San Francisco, Cal., E. R. Young, of Los Angeles, Cal., Russell A. Mackey, of San Francisco, Cal., and H. R. Kelly, of Los Angeles, Cal., for respondent and claimant.

JAMES, District Judge. In June, 1923, there was shipped at the port of London, England, by Balfour, Williamson & Co., aboard the Cardiganshire, 47,800 bags of cement, consigned to Balfour, Guthrie & Co., at Portland, Or., with consignee's option to take delivery at Astoria or Longview. While

the cargo was in transit, the consignee sold the cement to libelant herein. With the consent of the ship, libelant diverted the cement to the port of Los Angeles. From the same port of origin there had been shipped in the Cardiganshire by a different consignor another lot of cement, amounting to approximately 59,985 sacks, which was consigned to Geo. L. Eastman Company at the port of Los Angeles. At the time of the arrival of the ship, libelant, being resident at Portland, sent its representative from that city to Los Angeles. This representative made a sale of the cement to several purchasers, who were to take delivery at the dock.

The ship's agent at the port of Los Angeles employed stevedores to discharge the cement, both that consigned to libelant and that consigned to the Geo. L. Eastman Company. The cement intended for Eastman was known as the "Hand" brand, while that intended for libelant was "Pyramid" brand. Libelant contracted with its purchasers to deliver "Pyramid" brand. It appeared by the evidence that the "Hand" brand cement was inferior to the "Pyramid." Handlers engaged in unloading the cargo mixed the two brands. Three of libelant's purchasers complained when they found that "Hand" brand was mixed with "Pyramid." The "Hand" brand, mixed in the deliveries made to libelant's customers, amounted to 13,564 sacks; in addition to this there was an admitted short delivery at the dock of 53 sacks, making a total of 13,617 sacks, or 1,762.25 barrels, for the value of which libelant is suing.

Libelant's representative, who went to the port to arrange for the sale and delivery of the cement, testified that upon the arrival of the Cardiganshire he visited the ship and talked with the chief officer, stating: "I told him I had so much K., B. & S. Pyramid brand cement on board. * * * I told him that I had so many barrels of cement on the ship, and I also told him to be careful; that all I wished was my own cement; that I understood there was another brand of cement in the ship's hold, and I did not want to get them mixed." He stated, further, that the chief officer said that he would "look after it very carefully and follow the general procedure."

The witness Thomson, representative in Los Angeles of Balfour, Guthrie & Co., libelant's vendor, assisted in communicating libelant's wishes as to the discharge of the cement cargo. He testified that, before the cement was discharged by the ship, he called the office of the ship's agent on the telephone and talked with a man connected therewith. This witness testified that in that conversation he advised the agent's office that he had heard that there was some "Hand" brand cement on the vessel, and that his brand was the "Pyramid" brand; that he wanted the ship's agent to be "very careful with regard to the discharge of the Pyramid, and see that the two brands were not in any way mixed up."

The bags containing the "Pyramid" brand cement bore the stenciled mark in large letters, covering two-thirds of the height of the bag: "B., G. & Co. Portland, O. 94 lbs. net. Made in England." The "Hand" brand cement was plainly stenciled. At the top there was a large "A" within a diamond, and below appeared the lettering: "Los Angeles, 94 lbs. net. Made in England." There was testimony indicating that tin tags were tied into the wire that bound the top of the bags. To illustrate the kind, two tags were filed under stipulation of counsel, to supplement the testimony of witness Macleay, libelant's agent. The tags presented are quite different in their appearance. Each bears the name of the manufacturer and, in the center of the tag, on one is the figure of a pyramid, and on the other the figure of an open hand. The stevedore foreman, who was immediately in charge of the unloading of the cement, testified that he had received no instructions to keep brands of cement separate, and that the stevedores did not make any separation as between brands.

The firm acting as ship's agent accepted instructions from the libelant's representative to have the cement loaded on cars at the dock and billed to several purchasers by the names and at places designated. A portion of the lot of cement which remained after the sales orders had been filled was, under these instructions, piled on the dock. The ship's tackle landed the cement on trucks alongside the cars, and it was wheeled into the cars on the plasterboard carriers on which it was lifted from the hold. The stevedores performed all of the work of discharging the cement and loading it into the cars, although the agent firm furnished evidence to show that it made a charge on its own account against the consignee for the work of loading the cars, and a corresponding deduction from the stevedore charge against the ship. This feature of the evidence is noticed because of the claim made by respondent that, if the cement was mixed in the cars, it was not the fault of the ship, but the separate fault of those engaged in performing the additional service of load-

ing after the ship had completed its duty of discharging the cement at the delivery tackle; and the added point that the mixed condition of the lot of necessity was discoverable and discovered at the moment of loading on the cars, and that this condition would prevent any claim being prosecuted for damages beyond the precise period of limitation fixed in the bill of lading. That matter will be again referred to.

A checker of the railway company called the attention of an assistant of the ship's agent to the fact that there were different brands of cement being brought out, but the agent responded: "What the ―――― is the difference? This is all cement, isn't it?" The fact was, as was clearly established, that the cement, whether mixed in the hold of the ship or not, was brought out on the plasterboard carriers in a mixed condition, and was so delivered by the ship to the cars as the cement belonging to libelant. Libelant's agent, having made sale of the cement, and having made arrangement for its shipment by the agent firm, had returned to Portland before the cement was discharged, and was not advised that any mixing of brands had occurred until he received word to that effect from purchasers to whom cement had come. He then returned to Los Angeles and endeavored to adjust the matter with the agent firm.

It can hardly be said to admit of question that the respective consignors at the port of London shipped distinct and unmixed lots of "Pyramid" and "Hand" cement. On the bill of lading issued at the London office of the ship, the consignment purchased by libelant is described as "47,800 bags Pyramid brand cement." In the left-hand column, under the heading "Declared Marks and Numbers," there appeared the words and letters: "C. P. C. Co. Portland, O. 94 lbs. net. Made in England." No such lettering appeared in either stenciling on the bags of either lot of cement, but it does appear on the tags submitted that the manufacturer of the "Hand" brand cement was Gilingham Portland Cement Company, while the maker of the "Pyramid" brand was Knight, Bevan & Sturge. If the metal tags, because of the maker's name only, read in connection with the bill of lading, afforded any reason why there might be a confusion of identity, the tag on libelant's cement had the picture of the pyramid, while that on the Eastman cement had the picture of an open hand.

Furthermore, the bill of lading distinctly described libelant's cement as "Pyramid brand cement," and the bags of that brand bore the initials of the consignee prominently made, to wit, "B., G. & Co." The "Hand" brand cement comprised a totally separate shipment, from a different consignor to a different consignee, with a different port of discharge indicated plainly in stenciled letters. There was not room for confusion because of lack of identification marks. There was testimony showing that cement sifts through bags and coats the exterior with its dust, so that distinguishing marks are not easily seen; but the use of the large letters and characters stenciled in black, it may be fairly concluded, was for the purpose of meeting this condition, and it is reasonable to conclude that the brands would be apparent, or could easily be made so, upon being examined by any one who desired to observe the marks. Moreover, the fact that the brands on the bags were not the same attracted the attention of handlers loading the cars; these men were not, however, advised that "Pyramid" only belonged to libelant.

[1] Having received a specific lot of cement from a particular consignor, regardless of marks and brands, it became the duty of the ship to so segregate the shipment from other merchandise of like kind that it could and would be discharged separately, and not confused with the other merchandise. No other conclusion can be arrived at than that the ship, through its negligence in failing to keep separate the distinct lots of cement when loaded, or to separate the same and offer delivery of the particular kind to which each consignee was entitled, produced the condition which resulted in the loss to the libelant.

[2] The ship did not, as its lading contract required it, deliver at the end of its tackle, for convenient acceptance by the libelant, the cement consigned to the latter. It offered a mixed lot, a portion of which belonged to the libelant and a portion to a wholly different consignee. Nor under the conditions attending the discharge of this cargo was the duty cast upon the libelant to stand at the place of discharge and carefully check each bag of cement, to make sure that it was getting what it had a right to presume the ship would deliver to it. Undoubtedly libelant had the right to assume that its cement, and no other, would be delivered to its agents.

The discharge of the cement from the ship was fully completed about 10 days after its arrival, on about the 8th day of August, 1923. It was in the early part of September following that the agent of libelant at Portland received word that a mixed lot of ce-

ment had been delivered to libelant's patrons. This agent returned to Los Angeles and called upon the ship's agent. This witness testified that the ship's agent then told him that he knew all about the cement having been mixed, and wished "us to help him out to the best of our ability"; that in company with the agent he viewed the cement that had been delivered. It was shown that under the direction of the ship's agent a large quantity of the cement which had been so delivered was separated, and a portion of the "Hand" brand was delivered to the consignee of that lot of cement. Eastman & Co. refused to accept the full amount of "Hand" brand to make up the quantity billed to them, for they had already received the "Pyramid" (a better cement), and offered the excuse that they had disposed of the "Pyramid," having accepted it as a part of their shipment. The ship's agent, to avoid storage charges, sold a large quantity of the "Hand" brand which he had received from libelant's customers; his statement in evidence being that he sold it "for whom it may concern."

One Neal Woods was one of the purchasers of cement from libelant, and from his charge was taken a large quantity by the ship's agent, who had previously, in company with libelant's representative, viewed the "Hand" cement in Woods' custody. A portion of the "Hand" cement received by Woods, and amounting to 6,556 sacks, was not returned to the ship's agent, although Woods was well aware of the effort of the agent to collect the misdelivered cement and adjust the matter satisfactorily to libelant. Demand was made of the man in charge of the warehouse, who held that cement under instructions from Woods, and its delivery was refused. In this behalf Woods testified:

"A. I told Mr. Jacobs not to let anybody take any cement out of there, unless they showed the proper authority.

"Q. What authority did you have in mind? A. I didn't know who the cement belonged to, on account of the mix-up. I looked to the Beaver Portland Cement Company. I didn't know what disposition they had made of it.

"Q. The Beaver Portland Cement Company never asked you to release the cement? A. They never said anything about it.

"Q. You paid the warehouse charges on that cement from time to time, didn't you? A. Yes."

[3, 4] The foregoing general statement of the facts, as the evidence establishes them, will be sufficient for the purpose of testing the validity of the contentions made on the part of respondent. These in brief are:

(1) That the evidence is insufficient to show that the cement was not mixed at the time of shipment.

(2) That, if mixed by the cargo handlers in the work of discharging it, libelant's agents had notice of the condition, and were bound to correct the mistake before the cement was shipped on the cars.

(3) That, assuming some negligence on the part of respondent, libelant was also negligent in the regard last stated; hence that the damage should be divided.

(4) That the refusal of Woods to redeliver the 6,556 sacks of "Hand" brand cement amounted to an acceptance by the libelant of that cement, and bars a recovery for that particular lot.

(5) That the condition of the bill of lading requiring notice of the claim to be made within 48 hours after "arrival" of the ship was not satisfied.

(6) That the condition of the bill of lading requiring claim to be made within 2 months after the date of the "arrival" of the ship at destination was not satisfied.

Conclusions in favor of the libelant on the first three questions have already been indicated.

[5] As to the 6,556 sacks included in the Neal Woods delivery, I am of the opinion that respondent's position is well taken. Both libelant's agent and Woods were advised that the ship's agent was endeavoring to correct the mixed deliveries of cement. Woods for the time being must be viewed as the agent of libelant. He was in immediate charge of the cement, and, as such agent, with full advice of the conditions as noted, it was his duty to redeliver the "Hand" cement upon demand. It was furthermore a part of libelant's duty to express in some appropriate way an offer to return to the ship the merchandise which it claimed did not belong to it. The action of Woods, as the agent of libelant, in refusing to redeliver the cement, I am satisfied, amounted to an acceptance by the libelant of the 6,556 sacks, and that no recovery can be allowed on that account.

[6, 7] 5 and 6. The questions under the heads just indicated can be considered together. Where the carrier has had no notice that it has been at fault by failing to deliver or by misdelivering, it can stand upon and insist that the limiting conditions as to giving information of the claim and the making of demand on that account shall be literally complied with. Without reviewing the

authorities, numerous of which have been cited in the briefs on both sides, I think that it may fairly be stated, however, that such conditions of limitation in bills of lading are to be given reasonable and not unvarying effect, dependent upon the facts of the particular case. Here the ship's agent had information, through its superintendent employee, who was actually in charge of unloading the ship, that mixed lots of cement were being raised from the hold and landed upon trucks, which immediately went into the cars. Notwithstanding that information, when the superintendent had his attention called to it, he refused to investigate, saying that "it was all cement, anyhow."

Within one month's time libelant's representative had conversed with members of the firm which acted as respondent's agent, and it was then made plain that respondent's agent knew that there had been a mixing of the cement, and it proceeded to use its best efforts to have the mistake righted, by securing the delivery to the respective consignees of their proper brand. It failed in this effort, because of the Eastman Company's refusal to redeliver "Pyramid" cement which it had received. The formal claim was made for the damage about October 10, 1923, which was a few days over the two-months period subsequent to the completing of the discharge of the cargo. Under all of these circumstances, I think it must be concluded that respondent is estopped from insisting that libelant is barred from any right to recover because of the limiting terms of the bill of lading.

[8] In so far as the condition designates the commencement of the periods of limitation as of "the date of the arrival of the ship at destination," that term, I think, must be construed in a case like this, where misdelivery is charged, as meaning the date when cargo is discharged and offered for delivery; otherwise, as libelant's counsel well suggests, where discharge of cargo did not commence upon the arrival of the ship, the limiting period might elapse before a consignee had any opportunity to discover the shortage or mistake, or the ship might be for many days engaged in discharging other portions of cargo, with which the complaining consignee had no concern, before reaching the latter's merchandise.

[9] The further question is argued as to whether, in measuring the amount of libelant's recovery, there should be allowed the invoice value of the cement, or the market value at the place of destination. Evidence was offered on the part of libelant in the first instance, showing that "Pyramid" cement was worth at the time it should have been delivered to the libelant at the port of Los Angeles from $2.50 to $2.75 per barrel. At the time this evidence was offered, counsel for libelant affirmatively stated that libelant relied upon the local value as a basis for recovery. Later, in the course of the trial, the agent of libelant was asked to tell what the invoice value of the cement was, to which respondent made objection. The bill of lading contains the condition that "the liability in respect of any package shall be based on the invoice value of the goods at the port and time of shipment."

Conceding the binding effect of this condition as to liability, two considerations impel me to adopt the market value at the port of destination: First, the express agreement of counsel for libelant at the trial that he would rely upon such a value; second, that, if libelant were to be relieved of this stipulation, the testimony given by libelant's agent as to the invoice value was the statement only of the witness, who did not attend to the purchasing of the cement at London, and did not produce an invoice or any other written evidence of what his firm was charged for the cement by the London shippers. His testimony was that he had seen an invoice, and that the price that he observed there stated was $2.80 per barrel. Exact and first-hand evidence might easily have been supplied, had libelant seen fit to take depositions to cover that matter. Libelant's price for the cement it sold to Neal Woods was shown to be $2.50 per barrel, and that price appears to be a fair indication of the market value at the time.

The decree will be in favor of libelant for the shortage of shipment delivery, less 6,556 sacks, at the rate of $2.50 per barrel, to wit, 1,762.25 barrels, at $2.50, which amounts to $4,413.12, together with costs.